131067, Federal Home Loan Mortgage Corporation v. Graff-Ross Holdings, Mr. Franklin. Thank you, Your Honor. May it please the courts, Jonathan Franklin for the appellate. Graff-Ross patents pass the threshold inquiry of Section 101 because they do not seek to monopolize and do not embody any fundamental economic practice long prevalent in our system of commerce. Accepting Freddie Mac's invitation, the District Court held that the patents were directed to the abstract concept of computing a price for the electronic sale of a fixed income asset and generating a all 600-plus claims at issue in this case, which we dispute, the claims would still pass muster under Section 101 because that concept is not a fundamental economic practice long prevalent in our system of commerce. But what if one didn't embed so many details into the statement of the abstract concept? And I certainly appreciate that defining the abstract idea in this line of cases is not the simplest thing in the world, but the more you put into this definition of the abstract concept, the less abstract it seems. And the less inventive than the rest of the invention might be. Might be, but the idea here at some slightly greater level of generality seems more even with the term fundamental thrown in. Well, on appeal, Freddie Mac is essentially trying to switch course here and maybe in response to what Your Honor is thinking about. And they have now, for the first time in this case, characterized the abstract idea that these patents are allegedly directed to, to be the much more general concept of computing a financial characteristic of an argument because they did not present that at any point in the proceedings below. It's similar to claim construction where this court has said, we're going to look at the case, even though claim construction is a matter of law, we're going to look at the case as it was presented below. And in this case, it would be the abstract idea that the district court identified. But even if one were to consider that new concept for the first time on appeal, the claims would still pass muster because they don't come close to seeking to monopolize the general concept of computing a financial characteristic of an asset. These claims, these patents claim specific methodology systems and apparatus for conducting electronic trading of fixed income assets. And they do so in many cases with multiple computers, multiple computer systems, multiple separately valued and separately computed components of assets. And importantly, when the claims were initially examined, and also in a re-examination that probably was instituted by Freddie Mac, the PTO found that these were in fact novel and inventive, that this had never been accomplished or achieved or thought of before the priority date of these patents. And I think it was... Can you remind me when that was? Sure. It was 1992. And I think that's important here because we're talking about a time period... I'm sorry, the it, what I meant by the it in my question was the re-exam. I'm sorry, the re-exam, when was that? I don't have that data, but I can get that. Before the world changed in this area. Did the world change with Bilski or when... Oh, you pick a date. Yeah. I'm not sure. The re-exam, I don't believe Section 101 was a subject of the re-exam. It wouldn't be, but certainly the initial and the examinations were conducted. The second of these patents were issued in 2011, before Bilski for sure. But in terms of the priority date, which is what I would like to stress, we're talking about patents that were subjected to a priority date of 1992. And it really is engaging in hindsight to say now, almost 25 years later, oh, this is just a routine implementation of computer technology. Back in 1992, one needs... So is your argument that if an idea is novel or non-obvious, that it's technological? No, that's obviously not just, that's not the sum total of it. That's necessary, but not sufficient. That's kind of like the fundamental of your argument that you're making now. What I'm saying, though, is that in the concept, when you're talking about abstract ideas and in Alice's court, the Supreme Court said that the ideas that qualify as abstract ideas for this purpose, for Section 101 in the economic realm, are those, and this is a direct quote, are the fundamental economic practice long prevalent in our system of commerce. And I think the court recognized that because, as Judge Trotter was somewhat alluding to, and as the case has made clear, every patent can be characterized in some way as involving some sort of an abstract idea. The diamond versus deer, the patent involved, the only novel part of that patent... That's why we have Step 2 of Mayo. That's right, but we also have Step 1, and in terms of the business methods patent, Bilski makes clear that the abstract idea, even though business method patents or commercial patents might have at their root an abstract idea, that's not sufficient to invalidate them under Section 101, even though in the business method area, you're not going to typically have satisfy the transformation test, for example, but you will have a situation where they are invented even though they may seem like they're just using computers to do something. And DDR Holdings in this court, one of the court's most recent opinions in this area, makes clear that just because you have a computer-implemented patent that involves an abstract idea, that does not make it invalid under Section 101. And again, we're talking here about a situation where the PTO has determined that nobody at the time of this patent, in 1992 when it was applied for, nobody had thought of or implemented an electronic fixed income asset trading system. Computer networks were in their infancy. The internet did not exist in any way, shape, or form that it does today. So in order to accept Freddie Mac's invitation to invalidate these patents, I think one would have to engage in the kind of hindsight which is inappropriate, we know, in obviousness inquiries, but also should be inappropriate in a Section 101 inquiry. You're going to look at these and that, as the PTO found, these patents were novel. These patents were new. They were not just the routine application of computer technology. If they were, somebody would have done it. So again, I think one of the things to really stress here is that Section 101 bars patents that effectively attempt to monopolize long-standing and fundamental laws of nature, natural phenomena, and abstract ideas that are the basic tools of scientific and technological work, or the building blocks. Let me understand your argument. I'm a little confused. You're saying, or rather, if a patent is novel and non-novice at the time that it was invented, I'm saying it is not abstract in the way that the Supreme Court has interpreted that test in Bilski and CLS Bank, and that it is also invented. So what we're trying to prevent here is somebody from using the basic tools of technological and scientific work, this is quoted in some of the cases, or the building blocks of our modern economy. We're trying to prevent people from being able to monopolize those things. Those are similar to the other created categories of natural phenomena and laws of nature. Those are the things that are open to everybody, reserved to none. Can I ask maybe just about thinking about it in the following way, if you can address this. Suppose that I thought that it was sufficient to be directed to an abstract idea that a claim was directed to the formation of a contract, which is an intangible and in that sense abstract, and information that went into the formation of one would have to get to step two and ask, is there something inventive about the use of computers in doing that? What would be the inventive aspect of the invocation of computers other than speed and volume? I think it would be, first of all, I would disagree that I don't think you're hypothetical for what it is. I think the inventive aspect here would be the system determined purchase price or the system determined price yield. Those things were done, as the PTO determined in its examinations and re-examinations, prior to these patents, there was no system for doing that in a system determined price. You would call your broker, so the prior art that the PTO relied on and talked about, you'd call your broker and he'd give you an estimate of what he thought the thing was worth, but there was no system out there. It's based on a very traditional yield industry calculation? He would give you what he thought it would be worth, but this system tells you, it gives you all the inputs from a publicly traded system, kind of a bond trading system, similar to what a stock trading system was, and it would come out with a system determined purchase price and the PTO determined, again, this is all we have in the record is what the PTO found. There was no prior art system that could do that. That was inventive, and we can think that, oh, that seems trivial now, but again, in 1992, there were not public computer networks of the sort that we're used to today. Private computer networks? There may have been, but again, we don't have evidence because the other side's burden was to prove the invalidity of these patents by clear and convincing evidence, didn't put any of that evidence in. So all the evidence we have here is what the PTO said, and the PTO said, these are novel, these are inventive, these are something that nobody had ever done before, and I think for taking Section 101, as the Supreme Court has told us we should in Alice Corp and Bilski, these patents pass that threshold. That doesn't mean, Your Honors, that these claims are necessarily valid. It just means they pass that initial threshold, which many cases have said is not a particularly onerous threshold. How would you say that this case is analogous to D.D.R. Holden's? I think it's analogous in the way that both cases involved what was alleged to be an abstract idea. Both of them implement that idea on using computers doing what computers do. In D.D.R. Holden's, it was just instructions of the sort that we see in the internet all the time, but that the key aspect in D.D.R. Holden's and the key aspect here is that in both cases, these patents are doing something, solving a problem in an innovative new way that wasn't done before, even though they are doing it on computers and even though they are using computers to do what computers do. And in D.D.R. Holden's, obviously, there was a new solution to the problem of how do you make one website look like another one. And in this case, as the PTO determined, and I keep coming back to that because that's all we have in the record, this was a new way of conducting electronic bond trading systems that had never before been implemented. Okay, Mr. Franklin, we want to save your rebuttal time. Mr. Moore. Good morning. May it please the court. The claims in this case are directed to the abstract idea of valuing a fixed income asset. Valuing a fixed income asset is a basic economic idea, exactly the same way the economic ideas in economic ideas. Do you disagree with Mr. Franklin's statement that the formulation of the abstract idea that you just gave was not one you gave in the district court? And if that's right, why should you be able to give it here? Yes, we do disagree. Our formulation of the abstract idea has no meaningful difference. It might use slightly different terms. We can use any of them. They all mean the same thing. Well, it might. Is it not even different in the level of specificity that the district court, at least if I'm remembering right, and I think Mr. Franklin was quoting the district court's opinion, identifying the abstract idea in a way that included many words involving electronic, this and that? Well, the district court characterized the abstract idea a few ways. In the first set of claims from the 2007 case regarding the 347 patent, it characterizes computing a price of a fixed income asset and generating a financial analysis output. And that abstract idea came from the two claims that were at issue in the 347 patent, claims 101 and 102. When we got to the second two cases, the case in 2010 regarding the 053 patent and the case in 2011 involving the 202 patent, they were briefed together. And so how the case transpired is we had the group of claims from the 347 in case one, then the briefing in case two grouped the claims. Group one of the nine groups that are before the court from the district court's opinion involved the exact same abstract idea, computing a price of a fixed income asset and generating a financial analysis output. Then the court looked at the successive groups of claims, 2, 3, 4, all the way through 9, and looked at the differences. And there was another characterization by the district court which talked about computing the yield discount rate for a fixed income asset. It actually dealt with those differently too. If you look at the district court's opinion, and this is regarding group six, what it said regarding those claims, the site for that is page 50 of the joint appendix, A0050. And what the district court said regarding group six was the claims there involved the computation of various equations. Because the court realized there was no difference between these computations of value. And that's all these claims are derived for. They all compute the value of a fixed income asset. There's no difference whether you're computing the price or you're computing the yield discount rate. In the terms of fixed income assets, which are before the court, yield discount rate is the present value of the fixed income. The whole patent was derived to breaking the property up into components. And so if I lease a property, for example, I might agree to lease you a piece of property for a year at $100 a month. And if I want to determine the present value of that, I first look at the yield, I'm going to get $100 a month. But then I also have to discount that based on the time value of money and other risks. You might not pay, you might default on your lease, other events might come up. So the yield discount is nothing more than the value of that property. And if you look at the Supreme Court cases, just because you specify what's computed doesn't make the abstract idea any less abstract. We have, for example, in Benson, the equations in that case computed pure binary numbers. That didn't make the claim not abstract. You have in Fluke, the court, the claim there computed an updated alarm limit. The fact you computed an updated alarm limit didn't make it patentable. And in Alice, you had computed adjusted shadow records, didn't make the claim patentable. What about DDR? DDR is a fundamentally different situation because the claims in DDR were necessarily rooted in technology. Here, we're not dealing with a claim necessarily rooted in technology. We're dealing with a basic economic concept like we had in Alice and like we had in Bilski. In fact, some of the prosecution history they cite refers to the prior art doing this with quill and carrier pigeon. That proves the point that this is, in fact, a longstanding economic process. And it is an abstract idea because it can be done in somebody's head. It can be done as a mental process. So here, the problem is not necessarily rooted in technology. It's also not solving a technological problem. The problem here was just doing the There was not a technological problem like you had in DDR when the person would be instantaneously transported from one website to a competitor or a vendor website. You don't have that. And there's no specific way. Here, we've talked about one of the things that were mentioned by my friend was the system-determined purchase price as being the inventive concept. We've got to break that down into its components. The system is even more generic than the general-purpose computer limitations that were cited in Alice. In Alice, you've got a data processing center. You had data storage. You had a communications controller. Those components were much more specific than just saying a system. And when you look in the patent here and it describes the system, all it says is that the computers that were used to perform this were IBM personal computers. And it specifies that it's not just IBM personal computers. Those are just an example. It could be any digital computer being used to perform these operations. And so then what you're left with is determining a price. Well, determining a price is part of the abstract idea. That's the basic economic concept, and that's not to be considered under Step 2 of Alice. Why wouldn't speed be rooted in technology as in DDR? For the same reason it was in Alice. Computers, simply taking an abstract idea and doing it more is pretty important in Alice, and it wasn't sufficient. And there's been many cases like that with Accenture and Bancorp where simply taking an abstract idea and loading it onto a general-purpose IBM personal computer is not sufficient. In DDR, you had a claim that was necessarily rooted in technology, and they were actually fundamentally improving the way the Internet operated. Because in DDR, before that, conventionally, somebody would be moved from the host website to a third-party website. But now after DDR, instead of losing control of that customer, you'd be moved to an outsourced provider's website. Then if you look in the claims in DDR, they actually provide a lot of examples of specifically what that outsourced provider's website needs to do to provide this new composite or hybrid site. It needs to be able, like, if you If you go to an outsourced provider's website, there's got to be new details. How do I know which of my customers' websites to show? So the claims require identifying that source so I know what my host website is. Then once I... So the actual subject of DDR was a novel, or at least allegedly novel, physical display and input physical system. That's not what's on here. Not at all. Here, there's nothing that improves the operation of computers in any way. Computers are just doing what they've always done. Can I ask, needless to say, I have not read all of the claims. Do any of the claims here themselves call for certain levels of speed or volume of processing? No. That's an important question about the number of claims here. In Freddie Mac's brief below at the district court, we grouped them into nine groups, and that's what the district court adopted. It didn't adopt them wholesale. It actually changed the wording at group six and group eight to what it thought was more accurate, and the district court did that. But here, if you look at the opening brief by Graf Ross, they say on page 32 of the opening brief, the court need only consider claim one of the 053 patent and claim one of the 202 patent. And so they actually, the only claims they argue separately are those two claims. It is my impression, but you've probably read these cases more recently than I, that we have not yet had a case in which the claim said, use a computer to do something people have been doing in their heads or with quills or even pigeons, but do it at the following volumes per second. I'm not sure we've had a claim like that. Do any of the claims here read like that? I'm not aware of any of the 616 claims reading like that in any way, and Graf Ross has not argued that separately. And since Graf Ross hasn't argued those claims separately, this court doesn't need to address them separately under its precedent in dealer track. Also came to the issue, there was some suggestion of whether there were some fact issues here. Here, there are no fact issues. First, we do think the concept of valuing a fixed income asset is a fundamental concept. As their prosecution history says, it's been done with quills, it's been done with carrier pigeons. So we believe it satisfies that. But still, if you look at the Supreme Court precedent, the test for an abstract idea is not as rigid as it must be a fundamental or longstanding idea. In fact, that's just one way the courts have characterized the abstract idea in certain cases. But if you look at Fluke, they presume the abstract idea was novel, and that wasn't sufficient to make it patentable. If you look at Bisafe, the court said even if the abstract idea is brilliant, it wouldn't make it patentable. So there are no factual issues involved here. If you look at the Supreme Court precedent… abstract idea precedents, at least in the Supreme Court, put aside ours for now, is that there are two kinds of abstraction. One is the mathematical abstraction, stuff in your head, and then there's legal entity, like contract abstraction. And in the second group, legal entity, contract abstraction. So far, at least, the Supreme Court, Bilski and Alice, have, I think in both instances, said what we have here, at least, is something fundamental. So maybe some highly complicated new sort of contractual arrangement might lie outside the you know, newfangled as opposed to fundamental abstract idea. Because this abstract idea is exactly like the abstract idea. In fact, I would say it's more abstract than the ideas of hedging risk in Bilski or intermediate settlement analysis. It's simply calculating the value of something. It goes back to the first marketplace. It was literally done with quills. And for that reason, this court can look at it as an abstract idea, just like it did in those cases. It's also, it is a contractual relationship, because you're really, in these claims, dealing with a sale between a buyer and a seller. One of the computers is providing bids, and the other one is calculating the price, and it's determined if it accepts those bids to kind of to make a sale. So it's a sales contract, just like the contractual relationship cases. And there are no factual issues here, because if you look at the Supreme Court's case, if you look at Alice and how it calculated, how it determined that the intermediate settlement was an abstract idea, it said it flowed from the previous cases. It flowed from the court's previous cases, and it looked back at Bilski. If you look at Bilski, Bilski said, I'm going to look back to Benson, Fluke, and Deere. And all these analysis, it's simply a legal analysis, looking back at the earlier abstract ideas in other cases. It's not a factual issue. And same thing here regarding the conventional computer components. They're not enough to transform these claims into patentable subject matter, simply because they're generic computer components, as is explained in our brief at 4, in the red brief. Last thing I'll mention is that the court did, or Graf Ross did suggest in this brief, the fact that claims were allowed over 102 and 103 would then in some way provide evidence that the claims are valid under 101. That's not true. 101, 102, and 103 are separate and distinct inquiries. A claim can be valid under 102 and 103 and still invalid under 101. In fact, in the last five years, the Supreme Court and this court have found many cases where the patent office found the claims were valid over 102 and 103, but the courts found the claims invalid under 101. It's because if you look at the steps of Alice under step one, the Supreme Court's spoken fluke, even if the abstract idea is novel, it's not sufficient to transform the claim into patentable subject matter. Do you know the answer to the question about dates of re-exam and whatnot that I asked, Mr. Franklin, or when did the PTO last look at these patents? The PTO last looked at it in the re-exam, but first thing, the PTO cannot consider 101 in a re-exam, so it couldn't have possibly ruled on that basis. And two, I believe it was before Bilski. The case was originally filed back in 2007, three years before Bilski. And the re-exam had been completed? The re-exam, I believe, was only on the 347 patent, but I don't remember the facts of that specifically. But even if you look at step two, Alice, just to conclude the last point, just because conventionality is not the exclusive test for whether something adds an inventive concept. An inventive concept has been defined in the Supreme Court as whether the claim adds significantly something more. And under step two, in ultramarital it said, even if that additional thing may be novel, it still may not be enough to make the claim patentable. The test is not whether it's inventive. For example, it could add a field of use limitation. And a field of use limitation, even though it might make the claim novel under 102 or 103, is not sufficient to make the claim patentable under 101. The concept of hedging in Bilski at some point was novel, but the fact that somebody claimed hedging in the energy markets still wouldn't have been patentable, even at that point when it was the first person to ever contemplate it. So it's still not sufficient to make the claim. Do you feel that that's the situation here? Well, here there's nothing in these additional claims. There's no additional elements in these claims that would transform the claims from unpatentable abstract ideas to patentable subject matter. The only additional limitations in these claims are conventional computer components, exactly like the conventional computer components analysis. And there are no factual issues to be cited. The only place there could be a factual issue is under claim construction based on TIVA, but here Graf Ross has never suggested, and Freddie Mac has never suggested, that there are any claim construction issues that affect this analysis. Any more questions for Mr. Moore? Thank you, Mr. Moore. Thank you, Your Honor. I'm just looking at the date. I think the initial re-exam that's 5159 of the appendix, that would have been in 2012, but I believe it was pre-Bilski, is my recollection of it. But I think Mr. Moore is correct that that 101 wouldn't have been a subject in the re-exam. It would have been something the initial examiners would consider. Just briefly, on the characterization of the abstract idea, if one looks at pages 49, 28 to 29 of the appendix, you'll see that Freddie Mac identified the abstract idea in the 053 and 202 patent, precisely in the same manner the district court did. Nowhere did he identify the abstract idea as the broad concept of valuing a fixed income asset. I don't think we have any citations anywhere in the record where it made that contention. Can you point to the claims and actually show us what you think the inventive concept is? Okay. Yes, Your Honor. Because the claims don't speak to speed, don't speak to anything different. You enter data, pricing data, and you come out with pricing data. Right. Well, you have in the first patent that was considered, you have the 347 patent, you have the system-determined purchase price, and that's what the PTO determined was novel, that prior art could at best, and I'm reading from page 1892 of the record, prior art disclosed only the computer-implemented calculation of market-based components of properties, but do not teach or suggest determining a purchase price and consummating a sale and corresponding purchase of the components as recited in the patents. So we have on this record a PTO determination that that aspect of these claims was novel, and it is a technological innovation. It's novel under their definitions at the time that the panel has considered, but is it an inventive concept? I think it is. Do we understand that concept now? I would say yes, Your Honor. Show me where. Where in the claim is the inventive concept? Well, I just referred to the system-determined purchase price and other of the system-determining yield discount rates. Mr. Moore suggested that that could have been done with quill pens and carrier pigeons. That's not what the PTO held. The PTO held that that's what the art was prior to this invention. This invention did something that couldn't have been done. The closest prior art to an electronic bond trading system was described as being the telephone. The telephone cannot do a system-determined purchase price. That was a new where it was an advance in the field. It was a technological advance, and I don't think we can use our 2015 blinders and say, well, that seems kind of trivial because in 1992 when these patents were applied for, it wasn't. And to the extent there's any question in the court's mind, any question at all about what was or wasn't possible in 1992 to do or thought of doing, that's a factual issue. And at best, it's a remand issue. But we're looking at a legal issue and what was the law in 1992 is different from the law in 2015. And I'm asking you to assist the court by pointing to the claim and showing where the inventive concept is as we understand that term under law today. Okay. I think I've treasured it with the 347 in Claim 101. It's controlling a computer processor to compute a system-determined purchase price for the component of the asset. That's something the PTO said was inventive, that hadn't been done before, that nobody had done before, even though they were computerized asset valuations. I'm just relying, again, it's not what I'm saying. That's what the PTO is saying. And again, I think that if there's any question in the court's mind as to what was or wasn't possible in 1992, and again, the law has changed. The facts are not. The facts are the same. And legal determinations do often rely on factual decisions. At best, that's a remand. At worst, it's a victory for us because they didn't put in any of the evidence, at worst, from their perspective anyway. So I would encourage the court to look at this case, not focusing on what we think we know as of 2015, but what the PTO found was known and could have been done as of 1992. Thank you, Your Honor. We ask that the court refer suggestions. Any more questions? Okay. Thank you, Mr. Cracker. Mr. Moore, please.